DECISION
This action concerns alleged violations of the doctrine of informed consent and medical negligence in connection with laparoscopic surgery performed on plaintiff, Linda J. Spaight on March 23, 2004. The laparoscopic pelviscopy was intended to be a simple exploratory procedure to remove suspected endometriosis, but it resulted in the unanticipated removal of her ovary and fallopian tube, unintended perforation of her ureter, and four subsequent surgeries to repair the ureter and relieve conditions associated with urine draining into her body cavity.
After a lengthy trial by jury, the jury rendered a verdict in favor of the defendants. Plaintiffs now seek judgment as a matter of law, and alternatively a motion for a new trial, as to their claim of lack of informed consent in the nature of a battery against Dr. Bahram Shah-Hosseini (referred to commonly as "Dr. Barry Shah"), and a new trial against all defendants as to their claims of medical negligence. The defendants oppose all of plaintiffs' motions. Defendant, Dr. Barry Shah seeks judgment as a matter of law as to plaintiffs' informed consent and negligence claims against him. All defendants seek judgment as a matter of law as to causation *Page 2 
with respect to plaintiffs' claims of negligence against them. For the reasons set forth in this Decision, this Court grants judgment as a matter of law for plaintiffs on their claim of lack of informed consent in the nature of a battery against Dr. Barry Shah and, alternatively, a new trial as to that claim. This Court denies plaintiffs' new trial motions as to their claims of medical negligence against all defendants. As a result of its decisions on these motions, the Court need not reach defendants' motions for judgment as a matter of law.
 I FACTS AND TRAVEL
Plaintiff, Linda Spaight had been suffering from abdominal pain. Dr. Barry Shah initially suggested that she might be suffering from endometriosis and recommended a course of drug treatment to determine if that would relieve her symptoms. Endometriosis is a benign condition where the lining of the uterus escapes the uterus. It can involve the inner organs of the pelvis, including the ovaries, as well as the area behind the uterus. Endometriosis can cause severe pelvic pain. Ms. Spaight was reluctant to take medication for a condition that had not yet been diagnosed. At that point, Dr. Barry Shah recommended laparoscopic surgery, specifically an operative pelviscopy, to determine if she had endometriosis and to surgically remove any endometriosis that might be found.
Physician and patient discussed the contemplated procedure. Based on her testimony at trial, Ms. Spaight understood that the procedure would not involve any major surgery. She signed a consent form that authorized Dr. Barry Shah to perform an "operative pelviscopy and indicated surgery." She understood that phrase to mean a laparoscopic pelviscopy to determine if endometriosis was present and to remove any endometriosis found. Dr. Barry Shah viewed the consent more broadly, believing that it authorized him to determine through the laparoscopic *Page 3 
procedure whether any endometriosis was present and to conduct any further laparoscopic surgery that he deemed "reasonably necessary" to relieve Ms. Spaight of abdominal pain. Ms. Spaight raised a question at the time of signing the consent form as to its provisions regarding laboratory analysis of tissue samples. Dr. Barry Shah assured her that she need not worry about that provision because no such procedures were contemplated. The consent form described the risks associated with surgery as including "respiratory problems, blood clots, brain and nerve damage, heart attack, cardiac arrest, and/or death."
During the course of the laparoscopic pelviscopy on March 23, 2004, Dr. Barry Shah found extensive endometriosis and undertook surgery to remove it. He further found that the endometriosis involved plaintiff's left ovary and fallopian tube. According to his testimony, the ovary was completely diseased and had embedded within it a large endometrial cyst. Dr. Barry Shah was concerned that the ovary might be the source of plaintiff's abdominal pain that the surgery was designed, if possible, to correct. He therefore proceeded to remove the ovary and tube, a procedure called a salpingo-oophorectomy. In the process of removing the diseased left ovary, he used a tripolar electrocautery device to grasp, cut and cauterize the plaintiff's infundibular pelvic ligament which held the ovary in place. At the time he used the device, Dr. Barry Shah could not visualize the ureter nor did he know how close he was to it. Plaintiffs claim that the procedure to remove the ovary generated heat that caused a devascular injury to Ms. Spaight's ureter and two perforations of it that, in turn, caused urine to drain into plaintiff's abdominal cavity. These injuries did not appear until days after the surgery. Ms. Spaight was required to endure four subsequent surgeries and extensive hospitalization as a result of these injuries. *Page 4 
At trial, plaintiffs asserted two claims against Dr. Barry Shah for violation of the doctrine of informed consent. They first claimed a lack of informed consent in the nature of a battery, arguing that Ms. Spaight never consented to the removal of her left ovary and tube nor was ever apprised by Dr. Barry Shah of the possibility that those organs would be removed. Plaintiffs further asserted a violation of the more traditional negligence-based doctrine of informed consent, claiming that Dr. Barry Shah did not inform Ms. Spaight of the risk of injury to her ureter. Plaintiffs also asserted claims of negligence against all of the defendants. They contended that Dr. Barry Shah was negligent in removing Ms. Spaight's ovary because he never visualized the ureter — a requirement under the standard of care — before using the electrocautery device to cauterize her infundibular pelvic ligament. They also asserted a claim for medical negligence against Dr. Barry Shah's then-partner, defendant, Dr. Reza Shah-Hosseini, claiming that he either was in the operating room assisting in the surgery and failed to ensure the visualization of the ureter or that he should have been assisting in the surgery and failed to do so. Dr. Jennifer Botte, a resident, assisted Dr. Barry Shah with the surgery and in fact abandoned a direct role when the procedure became complicated. She, too, was sued for medical negligence for failing to ensure proper performance of the surgery. Women and Infants Hospital of Rhode Island was sued vicariously as Dr. Botte's employer.
At the close of the evidence, the defendant physicians moved for judgment as a matter of law as to the claims of negligence and lack of informed consent filed against them in plaintiffs' second amended complaint. Specifically, Dr. Barry Shah sought dismissal of the negligence and lack of informed consent claims asserted against him in Counts I and Count IV of that complaint, respectively, whereas Dr. Reza Shah-Hosseini and Dr. Botte sought dismissal of the negligence *Page 5 
counts asserted against them in Counts II and III of that complaint, respectively.[1] As to plaintiffs' negligence-based claim of lack of informed consent against Dr. Barry Shah, he argued that plaintiffs failed to establish that Ms. Spaight was unaware of the adverse consequences of the medical procedure. Dr. Barry Shah contended that Ms. Spaight signed a consent form that indicated the possibility of risk to "other organs" and that she testified inconsistently with respect to whether information regarding the specific risk to her ureter, if provided, would have altered her decision to proceed with the laparoscopic surgery. He further contended that Ms. Spaight failed to submit evidence of the likelihood of injury to her ureter and therefore failed to establish the materiality of the risk.
As to medical negligence, the defendant physicians contended that plaintiffs failed to establish causation, as they could not prove that an alternative surgical process would have eliminated the risk to Ms. Spaight's ureter. Defendants noted that Dr. Barbieri testified that had Dr. Barry Shah removed only the endometrial cysts and not the entire ovary, the risk of heat injury would have been reduced but not eliminated. Finally, Dr. Barry Shah argued that plaintiffs' expert relied on a pathology report that was not available to the physicians during the surgery.
In addition, defendant, Woman and Infants Hospital moved for partial judgment as a matter of law as to the claims asserted against it in plaintiffs' second amended complaint. Specifically, it filed this motion as to Count VI (Negligence — Women and Infants Hospital), Count VII (Lack of Informed Consent — Women and Infants Hospital), Count VIII (Corporate Liability — Women and Infants Hospital), and Count X (Res Ipsa Loquitur — Women and Infants Hospital). It also moved for judgment as a matter of law as to Count V, which alleged that the *Page 6 
Hospital was vicariously liable for the negligence of Dr. Barry Shah, Dr. Reza Shah-Hosseini and Dr. Botte. In support of its motion as to the portion of Count V relating to Dr. Botte, it joined in her motion for judgment as a matter of law as to negligence.
This Court granted judgment as a matter of law in favor of Women and Infants Hospital as to Counts VI-X of plaintiffs' second amended complaint as well as the portions of Count V asserting claims for vicarious liability against the Hospital for the negligence of Dr. Barry Shah and Dr. Reza Shah-Hosseini. It reserved judgment on the balance of the defendants' motions.
The Court then submitted the case to the jury on the issues of lack of informed consent by Dr. Barry Shah (Count IV) and negligence of Dr. Barry Shah, Dr. Reza Shah-Hosseini and Dr. Botte (Counts I, II and III). It was agreed that judgment as to the portion of Count V for vicarious liability against Women and Infants Hospital for the negligence of Dr. Botte would enter consistent with the jury's verdict or any judgment as to the negligence claim against her in Count III.
In instructing the jury on the law of informed consent, the Court did not distinguish, nor did the parties ask it to distinguish, between plaintiffs' informed consent claim in the nature of a battery and their negligence-based claim of informed consent. It likewise did not instruct specifically on the differing law applicable to those claims. It instead included instructions relevant to both of plaintiffs' informed consent claims under a single broad informed consent instruction and submitted a single interrogatory to the jury on the verdict form which simply asked it to determine if Dr. Barry Shah failed to obtain Ms. Spaight's informed consent.
After the Court charged the jury, Dr. Barry Shah raised certain legal objections to the Court's instruction on informed consent which he inexplicably failed to raise earlier when he submitted his proposed jury instructions to the Court. He asked the Court to eliminate reference *Page 7 
to physicians having a duty to "obtain" informed consent — suggesting instead that the duty is to convey information. He also asked the Court to add an instruction that a physician has no obligation to disclose risks likely to be known by the average patient. He further asked that the Court instruct that plaintiff must prove that if she had been informed of the material risks and alternatives to treatment, she would not have consented to the procedure in question (even though those two latter proposed instructions are not the law as to plaintiffs' claim of lack of informed consent in the nature of a battery).
At this juncture, the Court allowed the jury to commence its deliberations, in the afternoon, with no alterations in its instructions to the jury. After reflecting upon Dr. Barry Shah's objections to the charge, however, it had a profound concern that none of the parties had properly distinguished the law of informed consent relative to claims in the nature of a battery from the law of negligence-based informed consent claims, even though they agreed that both claims were in the case. Near the end of the court day, the Court ordered the jury to suspend its deliberations and, with the consent of the parties, reinstructed the jury the following morning on the law of informed consent. It advised the jury that plaintiffs were asserting two separate informed consent claims and described the law as to each claim. It specifically indicated that in proving the battery-based claim, plaintiffs did not need to prove that had Ms. Spaight known that her ovary and tube were to be removed, she would not have consented to the surgery. The Court also re-crafted its instructions to address defendants' other objections to the charge. It then recast the verdict form, in substitution for the first form that went to the jury, to ask the jury to determine if Dr. Barry Shah were liable under a theory of lack of informed consent and, if so, to indicate, in response to a second interrogatory, whether such liability was based on "lack of *Page 8 
consent to removal of ovary" and/or "failure to disclose risk of injury to ureter." No party objected to the fact or content of this reinstruction or the revised verdict form.
The reinstruction prompted plaintiffs to file a motion for judgment as a matter of law on their battery-based informed consent claim before resubmission of the case to the jury. This Court reserved decision on that motion. After further deliberations, the jury rendered a verdict in favor of all of the defendants as to all claims. Following entry of judgment, plaintiffs and defendants timely renewed their motions for judgment as a matter of law on which this Court previously had reserved decision. In addition, and in part in the alternative, plaintiffs seek a new trial as to their battery-based informed consent claim.
 II PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW A. Standard of Review
Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." R.I. Super. Ct. R. Civ. P. 50. In reviewing a motion for judgment as a matter of law pursuant to Rule 50, the trial justice must consider the evidence "in the light most favorable to the adverse party and is obliged to give such party the benefit of all reasonable and legitimate inferences which may be properly drawn therefrom. . . ." Pimental v. D'Alliare,114 R.I. 153, 156, 330 A.2d 62, 64 (1975); see alsoMalinowski v. UPS, Inc., 792 A.2d 50, 55 (R.I. 2002). After such review, if there are no remaining factual issues upon which reasonable persons might draw different conclusions, the motion should be granted. Skaling v. Aetna Ins. Co., 742 A.2d 282, *Page 9 
287 (R.I. 1999). If pertinent factual issues remain unresolved, however, the Rule 50 motion should be denied. Malinowski,792 A.2d at 55.
Under Rule 50, motions for judgment as a matter of law may be made at any time before submission of the case to the jury. In this case, plaintiffs made their motion for judgment as a matter of law with respect to their battery-based informed consent claim after this Court submitted the case to the jury the first time but before resubmission of the case to the jury after reinstruction. As defendant Dr. Barry Shah has not pressed an objection to this motion on grounds of lack of timeliness, and as plaintiffs filed their motion before resubmission of the case to the jury under the Court's revised charge, this Court will deem this motion to have been filed timely and proceed to address it on its merits.
 B. Analysis
Plaintiffs claim that this Court should enter judgment as a matter of law against Dr. Barry Shah under Rule 50 of the Rhode Island Rules of Civil Procedure as to their informed consent claim. Plaintiffs argue that there is no dispute that Ms. Spaight did not consent to the removal of her left ovary and fallopian tube as part of the laparoscopic procedure performed on her by Dr. Barry Shah on March 23, 2004. Absent that consent, they argue that the salpingo-oophorectomy constituted surgery in excess of the consent she gave, in the nature of a battery. Plaintiffs contend that the surgery in excess of Ms. Spaight's consent entitles her to all damages that flowed therefrom: the wrongful removal of the ovary and tube themselves; the injury to her ureter during the surgery; and all consequential damages that resulted from that injury, including four subsequent surgeries and extensive hospitalization. *Page 10 
Defendant Dr. Barry Shah responds that Ms. Spaight consented not only to the operative pelviscopy but to all "indicated surgery" resulting from that procedure, which included the removal of her diseased ovary and tube. He contends that the removal of the ovary and tube was indicated, as the surgery was designed to alleviate her abdominal pain. He found that the ovary was completely diseased and had embedded within it a large cyst. Dr. Barry Shah believed, therefore, that he had the patient's consent to remove the ovary and tube, as the ovary may have been the cause of her pain.
1. Informed Consent
The doctrine of informed consent finds its common law roots in the landmark decision of Justice Cardozo in Schloendorff v. Societyof New York Hospital, in which he wrote:
 Every human being of adult years and sound mind has a right to determine what shall be done with his own body and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages. This is true except in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained.
211 N.Y. 125, 129-30, 105 N.E. 92, 93 (1914). The doctrine is thus rooted in the principle of self-determination, a right to bodily autonomy, and control over medical decisions. Miller v.Rhode Island Hosp., 625 A.2d 778, 783 (R.I. 1993).
After Scholendorff, the courts, including the Rhode Island Supreme Court, began to impose a specific duty on physicians to disclose to their patients the intended scope of treatment, its risks, and the alternatives to it to ensure that the patients consented, in advance, to the treatment provided. SeeHunter v. Burroughs, 123 Va. 113, 96 S.E. 360 (1918); andTheodore v. Ellis, 141 La. 709, 75 So. 655 (1917) (cited in Wilkinson v. Vesey,110 R.I. 606, 295 A.2d 676 (R.I. 1972)). This duty, distinct from the physician's responsibility to skillfully diagnose and *Page 11 
treat a patient, is known today as the doctrine of informed consent.See Lauro v. Knowles,785 A.2d 1140, 1141-1142 (R.I. 2001).
Initially, the courts split over the question of whether an alleged failure of a physician to disclose adequately the risks and alternatives of a proposed treatment should be characterized as a battery action or an action grounded in negligence for violation of the doctrine of informed consent. Cf. Bang v. Charles T.Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958) andGray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966) (analyzing physician's failure to adequately disclose risks and options for treatment as an action in assault) with Mallet v.Pirkey, 171 Colo. 271, 466 P.2d 466 (1970) and Peterson v.Shields, 652 S.W.2d 929 (Tex. 1983) (analyzing physician's failure to adequately disclose risks and options for treatment as an action in negligence for violation of the doctrine of informed consent).
The Rhode Island Supreme Court first wrestled with this question in Wilkinson v. Vesey,110 R.I. 606, 295 A.2d 676 (R.I. 1972) — its seminal decision on the doctrine of informed consent. It declined to follow those jurisdictions that had held that "any treatment or procedure given without informing the patient of its inherent risks vitiates the consent and allows suit based upon the theory that a battery has been committed." Id. 110 R.I. at 619-20, 295 A.2d at 685-86. It ruled, instead, that "where . . . the procedure is authorized but the patient claims a failure to disclose the risks involved . . . the claim sounds in negligence."[2] Id.110 R.I. at 621, *Page 12 295 A.2d at 686. It narrowed medical battery actions — first recognized inNolan v. Kechijian,75 R.I. 165, 64 A.2d 866 (1944)[3] — to cases where the medical procedure is "completely unauthorized." Id.
The Wilkinson decision remains at the forefront of informed consent law, as the majority of jurisdictions have characterized a failure to disclose material risks and alternatives to treatment as a negligence action, while permitting the application of battery law to remain in the more limited category of cases where the procedure was unauthorized.[4] In Blanchard v. Kellum, for example, the court recognized the "distinction between: (1) cases in which a doctor performs an unauthorized procedure; and (2) cases in which the procedure is authorized but the patient claims that the physician failed to inform the patient of any or all the risks inherent in the procedure."975 S.W.2d 522, 524 (Tenn. 1998). The court used a "simple inquiry" and found that if the patient was not aware that the "doctor was going to perform the procedure," nor did the patient authorize the procedure, the plaintiff had a cause of action for medical battery.Id.
The contours of this debate are rooted in common sense, as there are many factual situations where applying negligence-based informed consent law in the place of battery-based informed consent law would be illogical. In cases where the procedure was not even considered *Page 13 
beforehand, it does not make sense to apply a test requiring a plaintiff to prove that the physician had a duty to disclose a "material risk" of that uncontemplated procedure. In Mink v.University of Chicago, for example, the plaintiff filed a claim on behalf of thousands of women who were given diethylstilbestrol (DES) as part of a double blind study. 460 F. Supp. 713 (D. Ill. 1978). The women were not told that they were part of the experiment nor were they told that they were taking DES as part of their prenatal care.Id. at 715. The defendants filed a motion to dismiss the plaintiffs' complaint for battery on the grounds that the action was a "lack of informed consent claim" that sounded in negligence rather than a battery. Id. at 716. The court held that although Illinois courts have adopted the modern approach to "true informed consent cases," they have not "overruled earlier cases which recognize a cause of action in battery" for procedures performed without a patient's consent. Id. at 717 (citing Pratt v.Davis, 224 Ill. 300, 79 N.E. 562 (1906); Church v. Adler,350 Ill.App. 471, 113 N.E.2d 327 (1953)). The court acknowledged the two separate theories and explained that a battery action may "still be the proper cause of action in certain situations. . . ."Id.
The court in Mink referenced Green v. Hussey as an example of a proper application of a negligence theory of informed consent. Mink, 460 F. Supp. 713 at 717 (citingGreen,127 Ill. App.2d 174, 175, 262 N.E.2d 156, 157 (1970)).[5] InGreen, the plaintiff was told she was going to receive cobalt radiation treatments, but claimed she was never informed of the risks. Green,127 Ill. App. 2d at 176-177, 262 N.E. 2d at 157-158. That case was contrasted with the facts in Mink, where the plaintiffs were "completely unaware of the DES treatment." Mink,460 F. Supp. at 717 n. 3. Where the patient did not consent to the treatment, it is "meaningless to ask whether *Page 14 
the doctor should have revealed certain risks necessary to make the consent an informed one." Id. at 716; see Trogun v.Fruchtman, 58 Wis. 2d 569, 598-599 (1973) (reasoning that battery theory of liability is improper in situations where the alleged misconduct on the part of the physician involves a failure to disclose risks of treatment, but may be appropriate "where an organ" other than that consented to was removed); see alsoSamoilov v. Raz, 536 A.2d 275, 278-279 (N.J. Super. 1987) (holding that battery theory of liability is appropriate when the performed procedure was "substantially different" from that to which consented was given).
While some courts recently have held that an action sounding in negligence, as opposed to battery, is appropriate even in situations where the procedure completely lacked consent, [6] this Court finds that approach illogical. Instead, this Court finds the reasoning of the Louisiana Supreme Court in Pizzalotto v. Wilson to be more persuasive and consistent with the majority of jurisdictions. 437 So.2d 859, 862-864 (La. 1983).[7] ThePizzalotto decision, on all fours factually with the case at bar, dealt with a physician who performed laparoscopic surgery and believed the plaintiff's reproductive organs were so "severely damaged" that he performed a hysterectomy, claiming that "failure to remove the reproductive organs would result in pain and infection." 437 So.2d at 862. The court applied battery law, finding the law of negligence-based informed consent to be inappropriate because the removal of the plaintiff's ovary and other reproductive *Page 15 
organs could not logically be considered a "risk" of the laparoscopic procedure that should have been disclosed.Pizzalotto, 437 So.2d at 863.[8]
This Court finds that battery law remains appropriate in situations where a physician performs a procedure without the patient's consent; in that case, battery law is not subsumed by the negligence-based doctrine of informed consent. Our Supreme Court said as much in Nolan (where it recognized an action for battery for the removal of a patient's spleen without consent) and in Wilkinson (where it recognized a battery action for an unauthorized procedure). Wilkinson,110 R.I. 606, 295 A.2d 676; Nolan,75 R.I. 165, 64 A.2d 866. As Dr. Barry Shah had not planned to remove the plaintiff's ovary, the procedure does not categorically fit into a "known risk" of which the Wilkinson test requires disclosure; it thus is inappropriate to apply theWilkinson test to the case at bar.[9] As the court inMink explained, if a patient does not consent to the procedure, it is "meaningless to ask whether the doctor should have revealed certain risks. . . ." Mink, 460 F.Supp. at 716. As neither party suggests that the removal of plaintiff's ovary and tube was a risk of the laparoscopic pelviscopy procedure or that negligence-based informed consent law is the appropriate framework for analyzing plaintiffs' battery-based informed consent claim here, this Court will apply battery law.[10] The central question, therefore, is *Page 16 
whether there was a legally sufficient evidentiary basis for a reasonable jury to find that the defendant did not commit a battery in removing plaintiff's ovary and tube.
2. Legal Standard for Battery
In Rhode Island, the current standard for medical battery claims dates back to the Nolan decision where the plaintiff consented to an operation to "build up the ligaments that held the spleen in place." Nolan v. Kechijian,75 R.I. 165, 166, 64 A.2d 866, 867 (1949). During the course of the procedure, the doctor removed the plaintiff's spleen. The court inNolan held that "generally speaking, unless an immediate operation is urgently and reasonably necessary, a surgeon has no right to perform such operation without the patient's consent, express or implied." Nolan,75 R.I. at 168, 64 A.2d at 867.
The Nolan decision establishes that a claim for medical battery requires proof that the medical procedure performed was: (1) "without consent or in excess of consent" of the patient; and (2) was not "pathologically necessary or reasonablyincidental to the procedure to which the patient gave consent."Nolan, 75 R.I. at 169, 64 A.2d at 868 (citing 76 A.L.R. 562, anno. (1932)) (emphasis added). The court reasoned that while a surgeon should be allowed "reasonable latitude" in operating within the scope of the patient's consent, the surgeon should not be allowed "free license to operate at will."Id. 75 R.I. at 168, 64 A.2d at 868 (finding that there was no evidence to "warrant a conclusion of consent to the removal of the spleen, nor was there any evidence that the excision of that organ was pathologically necessary or reasonably incidental to the operation consented to"). As the Rhode Island Supreme Court reaffirmed Nolan in Wilkinson, this Court applies theNolan standard for battery to determine whether judgment as *Page 17 
a matter of law is appropriate in the case at bar. SeeWilkinson,110 R.I. at 619-621, 295 A.2d at 685-686
(citing Nolan, 75 R. I. 165, 64 A.2d 866).
 a. Consent to Removal of Plaintiffs' Ovary and Tube
With few exceptions, a "surgeon has no right to perform" an operation without a patient's consent. Nolan,75 R.I. at 168, 64 A.2d at 868. If the surgeon fails to obtain such consent and nonetheless performs the procedure, he or she has committed a battery. Id. The Supreme Court in Nolan
explained that an "adult patient is entitled" not only to "rely on the representations of a surgeon" but also to "limit his [or her] consent to an operation reasonably appropriate." Id. As the patient has the "right to be the final judge to do with his [or her] body as he [or she] wills," consent must be given by the patient and cannot be interpreted by the physician when language is ambiguous.Wilkinson, 110 R.I. at 625, 295 A.2d at 688. Viewing the evidence in a light most favorable to Dr. Barry Shah, this Court must determine whether a reasonable fact finder could determine that plaintiff, Linda Spaight consented to his removal of her ovary and tube.
This Court must approach the issue of consent in light of the admonition in Wilkinson that a medical battery action is limited to a procedure that is "completely unauthorized."110 R.I. at 621, 295 A.2d at 686. This phrase, while not defined inWilkinson, has been held in other jurisdictions to mean a procedure that the patient was not aware the physician would perform or treatment that is substantially different from that to which the patient consented. See, e.g., Messina v.Matarasso, 729 N.Y.S.2d 4, 7 (2001); Gray v. Grunnagle,423 Pa. 144, 156 (1966); Colucci v. Oppenheim,740 A.2d 1101 (N.J. Super. 1999) (citing Berroyer v. Hertz,672 F.2d 334, 342 (3rd Cir. 1982)); Lane v.Anderson, 345 Ill. App. 3d 256 (2004); Baltzell v. VanBuskirk, 752 S.W.2d 902, 906 (Mo. Ct. App. 1998); Tonelli v.Khanna, 569 A.2d 282 (N.J. Super. 1990); Samoilov v. Raz,536 A.2d 275 (N.J. Super. 1987). *Page 18 
In an instructive decision of the New Jersey Superior Court inSamoilov v. Raz, the plaintiff signed a consent form that included "possible resection of facial nerve." 536 A.2d at 276. The patient consented to a resection of the facial nerve only upon a finding of malignancy. During the surgery, the physician believed the mass "constituted a muco-epidermoid tumor," possibly a malignancy. Id. at 277. The defendant removed the tumor, later determined to be benign, leaving the plaintiff's face paralyzed.Id. The case was submitted to the jury on the issue of negligence-based informed consent, and the jury found that the defendant did not deviate from the professional standards owed to the plaintiff. Id. The plaintiff appealed on the grounds that the trial judge refused to include in his instructions a charge on battery. Id.
As in the case at bar, the plaintiff's contention inSamoilov was predicated upon the theory that he had never consented to the surgical procedure that the defendant performed and that the question of battery should have been presented to the jury in place of the negligence standard that was charged.Samoilov, 536 A.2d at 277. The plaintiff contended that the "operation that the defendant performed was not the one to which he consented, and that he authorized resection of [his] facial nerve only in the event the tumor was found malignant." Id. The Court wrestled with the same issue presented here regarding the boundaries of consent. It concluded that a plaintiff does not consent to the performance of an operation that is "substantially different" from the one to which the patient gave consent.Id. at 280-281. It held that there was no justifiable basis to submit the question of battery to the jury, as the possibility of the tumor's malignancy did not allow the procedure to be considered "substantially different." The plaintiff, therefore, had given consent. Id. at 281.
If the decisions in Wilkinson and Samoilov are read together, a procedure lacks consent only if it was both "completely unauthorized" and "substantially different" from the procedure to *Page 19 
which the plaintiff consented. Wilkinson,110 R.I. 606 at 620; Samoilov, 536 A.2d at 281. This view is consistent with the majority of jurisdictions. See,e.g., Mink v. University of Chicago,460 F. Supp. 713 at 716 (holding that plaintiffs who were given DES without being told they were taking it did not consent to the procedure, as they had "no clue" that they were part of a double blind study); Dubbs v. Head Start, Inc.,336 F.3d 1194, 1219 (10th Cir. 2003) (finding that where medical treatment is completely unauthorized and performed without consent, it constitutes a battery under Oklahoma law, and that such a claim survives summary judgment where an issue as to consent for an examination exists); Brzoska v. Olson,668 A.2d 1355, 1366 (Del. 1995) (holding that battery in a medical situation is properly limited to cases where a physician performs a procedure that is substantially different from the one consented to); Thomas v. Hickman,2006 U.S. Dist. LEXIS 72988, 90-91 (D. Cal. 2006) (denying a motion to dismiss a claim of medical battery where a plaintiff claimed that removal of her ovaries was not discussed prior to surgery, and therefore the surgery performed was substantially different from the one consented to).
In this case, there are no pertinent facts upon which reasonable persons might draw different conclusions as to whether plaintiff, Linda Spaight consented to the removal of her ovary and tube. The case at hand is distinguishable from the facts of Samoilov and applying the same law results in a different finding. SeeSamoilov v. Raz, 536 A.2d 275 (N.J. Super. 1987). InSamoilov, the plaintiff gave consent to the removal of the tumor on the condition that it was malignant. Id. at 277. Here, in contrast, plaintiff was never informed of the possibility that her ovary and tube would be removed, let alone given the opportunity to consent to specific situations in which they could or could not be removed. Had Ms. Spaight given Dr. Barry Shah express consent to remove her ovary and tube should they be diseased and covered with *Page 20 
endometriosis, like the consent obtained from the plaintiff inSamoilov, defendant's actions may not have constituted medical battery. However, by Dr. Barry Shah's own testimony, even the possibility of removal of plaintiff's ovary and tube in this case was never contemplated or addressed before the procedure.
As such, the removal of plaintiff's ovary and tube — a procedure that she was not aware Dr. Barry Shah would perform — qualifies as a "substantially different" procedure that was "completely unauthorized." Although perhaps not as drastic as the classic example of wrong side surgery, the removal of an organ — let alone an ovary and tube — is a far leap from a laparoscopic pelviscopy to diagnose and remove found endometriosis. Dr. Barry Shah confirmed in his testimony that he did not inform plaintiff, Linda Spaight that her left ovary would be removed (referred to as a left salpingo-oopherectomy) along with her left tube or that there was even that possibility because he did not intend, prior to surgery, to remove it.[11] He likewise did not inform her that he would be doing major surgery because he did not anticipate that her surgery would be major.
Here, both parties concede that there was no express consent by Ms. Spaight to the removal of her left ovary and tube. Plaintiff merely consented to the removal of endometrial tissue, signing a consent form that authorized Dr. Barry Shah to perform an "operative pelviscopy and indicated surgery." Plaintiff testified that she understood the language of the consent form to mean a laparoscopic pelviscopy to both determine if endometriosis was present, and if it was, to remove any endometriosis found. As she was never informed of any possibility that her ovary would be or even might be removed, she could not consent to such a procedure. *Page 21 
Plaintiff's expert, Dr. Barbieri, testified that a surgeon should have explicit consent to remove an ovary. He further testified that a physician would not remove an ovary and tube during a pelviscopy without explicit consent except in rare situations. Even defendants' expert, Dr. Young, agreed that Dr. Barry Shah failed to obtain such specific consent.
Plaintiff testified that she was not comfortable with drug treatment unless she knew that she had endometriosis. Ms. Spaight testified that she did not want to treat with pills something that she did not know existed, but that if defendant found endometriosis, she would take the suggested medicine. Dr. Barry Shah recommended the laparoscopic procedure to diagnose the endometriosis and to remove endometrial tissue. Ms. Spaight testified that Dr. Barry Shah told her that the most he would do was make 2.5 mm incisions and that if any major surgery were indicated, he would not do it that day. According to plaintiff's testimony, Dr. Barry Shah characterized the laparoscopic pelviscopy as a minor procedure taking twenty to thirty minutes and informed her that she could return to work in a couple of days.
Ms. Spaight testified that Dr. Barry Shah asked her to sign the consent form and that she complied with his request. Plaintiff testified that she and Dr. Barry Shah had no discussion about her ureter or the removal of her ovary or tube and that these organs were not mentioned on the form. Dr. Barry Shah's own testimony was consistent with Ms. Spaight's as to the information given her regarding the specific organs in question. Plaintiff further testified that she understood that there was a risk of injury to organs and that she was willing to accept that risk because of the benefit of finding out if she had endometriosis and removing any endometriosis found. Based on her discussions with Dr. Barry Shah, however, she believed those risks were minimal.
Dr. Barry Shah asserts that he believed the consent form authorized him to conduct any laparoscopic surgery that he deemed "reasonably necessary" to relieve his patient's abdominal *Page 22 
pain. He testified that he interpreted this consent form to authorize him to perform an operative pelviscopy as well as any surgery that he determined to be required. Dr. Barry Shah testified that he deemed it necessary to remove the ovary during the course of the surgery because it was fully diseased as a result of extensive endometriosis. It was, according to his testimony, covered by diseased adhesions and stuck to the pelvic sidewall. He testified that he was convinced that plaintiff had given him consent to remove the ovary and tube if such a procedure would remove the disease and potentially alleviate her severe abdominal pain.[12]
Dr. Barry Shah testified that while he did not mention specific organs, he told plaintiff that there were certain risks of infection and injury to organs from the laparoscopic procedure. He testified that he had a "vivid recollection" that Ms. Spaight read and signed the consent form. He testified that he did not tell her that there was a possibility that her ovary and tube would be removed because he did not plan to remove them. Dr. Barry Shah believed that the consent form granted him the authority to perform a salpingo-oophorectomy, if he deemed such a procedure necessary. He found that the ovary was a diseased organ, so he decided to remove it. He testified that based on his consultation with plaintiff, he was convinced that she gave him authority to remove her organ to get the disease out since he could not know before the surgery the extent of the disease of the organ. He explained that he "doesn't take ovaries for fun," but was "one-hundred percent sure he had her consent."
Only the plaintiff, however, can give consent. Nolan,75 R.I. at 168. Even Dr. Barry Shah admits that he told plaintiff that he would do a simple laparoscopic procedure to: (a) determine if she had endometriosis; and (b) remove any adhesions that he found. Defendant noted that all parties agreed that the first step in performing plaintiff's pelviscopy was to *Page 23 
determine the source of her troubles. The facts suggest that the plaintiff in no way expected the possibility that her ovary and tube would be removed and, therefore, did not consent to such a procedure. In fact, plaintiff was reluctant to begin any course of medical or pharmaceutical treatment until the diagnosis of endometriosis could be confirmed. Plaintiff had even raised an issue at the time of signing the consent form as to its provision regarding laboratory analysis of tissue samples. Dr. Barry Shah assured her that even such minor procedures were not contemplated. Plaintiff was not eager to leave her health in the sole hands of her surgeon and was an active participant throughout the process — that is until defendant took it upon his own judgment to remove her ovary and tube without first obtaining her consent.
Furthermore, an ambiguous phrase such as "operative pelviscopyand indicated surgery" on a consent form should not be interpreted to allow the physician to substitute his or her own judgment as to the procedure to be performed for the consensus as to such procedure reached by the physician and the patient after consultation. The consensus between physician and patient is the cornerstone of informed consent. See Rubino v. De Fretias,638 F. Supp. 182, 184 (D. Ariz. 1986) (stating that "[t]he essence of an informed consent question in a battery case is what procedure the patient agreed with the physician to have performed, and whether the ultimate contact by the physician was within the scope of the patient's consent") (citations omitted). The court in Pizzalotto found that signing a blanket authorization with a similar clause was "so ambiguous as to be almost completely worthless." 437 So.2d 859 at 863. Even the court in Nolan
cautioned that a doctor is not allowed "free license to operate at will." 75 R.I. at 168.
For the aforementioned reasons, this Court finds that the evidence, even when viewed in a light most favorable to defendant, Dr. Barry Shah, creates no genuine issue of material fact as *Page 24 
to consent. Reasonable minds could not differ as to whether Ms. Spaight gave her consent to the removal of her ovary and tube.
 b. Authority to Remove the Ovary and Tube even AbsentConsent
This Court next must consider whether the removal of plaintiff's ovary and tube nonetheless can be deemed to have been authorized, even absent consent, because their removal was "pathologically necessary" or "reasonably incidental" to the procedure to which she consented. Nolan, 75 R.I. 165 at 169. These exceptions to consent are meant to capture emergency medical procedures that if not performed could jeopardize a patient's life or health[13] or medical procedures that are slight, reasonable deviations from the procedures to which a patient consented such that under all of the circumstances the patient's consent to the extended procedure may be implied.[14]
 i. Pathologically Necessary
The Rhode Island Supreme Court has not yet had occasion to determine the boundaries of the phrase "pathologically necessary," as used in Nolan. Other jurisdictions, however, have held that the "medical emergency exception" applies when an immediate operation is urgently necessary and any delay in treatment could reasonably jeopardize the life or health of the patient.Pizzalotto, 437 at 862; see also Kennedy v.Parrott, 243 N.C. at 363, 90 S.E.2d at 760 (finding that the surgeon was legally justified in removing the plaintiff's ovary without consent when he knew the cyst could continue to grow until it was large enough to hold six to eight quarts of liquid and become life threatening); Rogers v. Lumbermens Mutual Casualty Co.,119 So. 2d at 650 (holding that an exception to required consent exists when a medical emergency arises and it *Page 25 
is "impossible or impracticable to obtain the patient's consent or the consent of anyone authorized to assume such responsibility);Temple Univ. v. Americhoice of PA, 55 Pa. D. C. 4th 78, 88 (2001) (defining an "emergency medical condition" as a "medical condition which manifests itself by acute symptoms of sufficient severity" which reasonably could be expected to result in: (1) placing the health of the individual in serious jeopardy; (2) serious impairment to bodily functions; or (3) serious dysfunction of any bodily organ or part).
In the case at bar, the defendant does not suggest that it was urgently necessary for him to remove Ms. Spaight's ovary and tube or that the failure to do so expeditiously could have jeopardized her life or health. While Dr. Barry Shah testified that her ovary was diseased and had endometrial cysts, he never testified that he believed during surgery that the ovary was cancerous or even pre-cancerous. Defendant never suggested that he was concerned that the cysts (or any part of the ovary that might remain after removal of the cysts) could cause a hemorrhage or any other life-threatening or dangerous health condition if they were left in place. As such, the uncontroverted evidence establishes that the medical emergency exception to the doctrine of informed consent is not applicable in this case and cannot be used by Dr. Barry Shah to excuse his failure to obtain consent. The removal of Ms. Spaight's ovary and tube simply was not pathologically necessary as a matter of law.
 ii. Reasonably Incidental
What Dr. Barry Shah does suggest is that he believed the removal of plaintiff's left ovary and tube was reasonably incidental to the operation to which plaintiff, Linda Spaight consented. He contends that Ms. Spaight consented to a pelviscopy and removal of endometrial tissue to resolve her abdominal pain. He avers that because Ms. Spaight did not limit the type of endometriosis that Dr. Barry Shah could remove, he effectively had her consent to remove her *Page 26 
diseased left ovary and tube. Dr. Shah contends that cysts within the ovary left no normal functioning part of the left ovary intact. He argues, therefore, that removal of the ovary and tube was reasonably incidental to the consented-to removal of the endometriosis.
It is true that a surgeon is permitted reasonable latitude to perform within the limitations of his or her patient's consent.Nolan, 75 R.I. at 168. A physician may respond to the conditions her or she is presented with once the operation has begun and no further consent can be sought. See id. However, there must be proof that any action taken to relieve the condition of the patient was "reasonably incidental" (or pathologically necessary) to the actual operation to which the patient gave consent. Id. at 168-169. This rule seeks to protect physicians who are faced with unexpected circumstances and perform necessary extensions of the surgery to meet the goal of the initial procedure. See, e.g., Pedesky v.Bleiberg, 2512 Cal. App. 2d 119, 123 (Cal. App. 2d Dist. 1967) (stating that "in cases where a doctor exceeds the consent and such excess surgery is found necessary due to conditions arising during an operation which endanger the patient's health or life, the consent is presumed. The surgery necessitated is proper (though exceeding specific consent) on the theory of assumed consent. . . ."); see also Fox v. Smith,594 So. 2d 596, 605 (Miss. 1992).[15]
Although a physician is given leeway to assume consent where a situation arises that extends beyond his or her expectation, the additional operation must be an extension of the first procedure rather than a separate operation or one of an entirely different character. See Preston v. Hubbell,87 Cal. App. 2d 53, 59-60 (Cal. App. 1948) (holding "that consent to the repair of the *Page 27 
broken jaw was implied under the circumstances of the case . . . [t]his is not, of course, to hold that consent to one operation is always to be regarded as implied consent to the performance of another operation, unanticipated by the patient, but which the surgeon, upon discovering unexpected conditions, may deem advisable . . . [e]ach case must be governed by its own facts"). Although the Court is satisfied that Dr. Barry Shah believed that the cysts on Ms. Spaight's left ovary so consumed the ovary as to make removal of the ovary and tube incidental to removal of the endometriosis, this Court cannot set aside the fact that the "incidental" action included removal of organs to which plaintiff did not consent.
To fall within the scope of what is reasonably incidental, the operation must be one of relatively minor significance in relation to the consented-to operation. "At first blush the word "incidental" connotes subordination to a primary purpose, and ordinarily the use of the word is regarded as referring to minor matters. . . ."In re Elimination of Highway-Railroad Crossing,271 A.D. 266, 276 (N.Y. App. Div. 1946); see alsoThe Robin Goodfellow, 20 F.2d 924, 925 (D. Wash. 1927) (finding that "`[i]ncidental,' obviously, means depending upon or appertaining to something else as primary. . . . something necessary, appertaining to, or depending upon another which is termed the principal, something incidental to the main purpose"). The term "incidental" also has been defined as "[b]elonging or appertaining to; following; depending on something more worthy."Thomas v. Harmon, 1887 N.Y. Misc. LEXIS 8 (N.Y. App. Term 1887).
This Court cannot find that Dr. Barry Shah's removal of Ms. Spaight's ovary and tube was dependent upon the more "worthy" operation of endometrial removal. To do so would trivialize such major surgery. Dr. Barry Shah was faced with a more complicated medical situation than he anticipated. The endometriosis he sought to remove was extensive and involved Ms. Spaight's ovary. He was within the bounds of her consent to remove that *Page 28 
endometriosis, inclusive of any endometrial ovarian cysts. Those acts could be deemed reasonable, as they all were designed to end her abdominal pain. But his actions in going so far as to remove plaintiff's ovary and tube were beyond a mere extension of the originally contemplated surgery; he performed surgery substantially different from, and far beyond the scope of, the operation to which Ms. Spaight granted consent.
Indeed, he performed major surgery after he assured her that the surgery would be minor. He performed this surgery against her will, as she testified that she would not have consented to removal of her ovary and tube, even under the circumstances discovered by Dr. Barry Shah, had he informed her of those circumstances in advance. There is no evidence that he needed to go so far as to remove her ovary and tube to meet the goal of her initial surgery, namely to remove endometriosis and end her abdominal pain. The cases that outline the meaning of an "incidental" operation all suggest that the operation that is incidental is one of minor significance. See In reElimination of Highway-Railroad Crossing, 271 A.D. at 276;The Robin Goodfellow, 20 F.2d at 925. Clearly, the removal of any organ, let alone the ovary and tube of a woman of childbearing age, is in no way minor, and reaches far beyond a mere incidental effect of such a laparoscopic procedure.[16] To find otherwise would be to equate important organs with benign, extraneous and unwanted tissue. Id. It would sanction the performance of surgery substantially different from the procedure to which the patient consented without requiring the surgeon to disclose the risks of such surgery — such as injury to the ureter — in advance.See Mink, 460 F. Supp. At 716. It would allow a physician to remove organs that the patient would not have allowed to be removed even had the physician sought consent. As such, as a matter of law, removal of plaintiff's ovary and tube was not reasonably incidental to the surgery to which she gave consent. *Page 29 
 c. Policy Considerations
This Court's interpretation of Nolan, as applied to this case, is supported by the testimony at trial and the policy underpinnings of the law of informed consent. Even the medical experts in this case testified that they would not have removed plaintiff's ovary and tube absent consent. Dr. Barbieri testified that absent an emergency, a seasoned physician would not remove a patient's ovary and fallopian tube without obtaining explicit consent. He testified that he would not remove an ovary and tube during a pelviscopy without explicit consent except in rare situations, as when a patient were bleeding to death or when the surgeon found cancer and thought it was best not to subject the patient to a second operation. Here, he believed that such a procedure was not necessary to save her life and there was no indication of cancer. Defendant's expert, Dr. Young, also testified that he would not remove an ovary from a potential childbearing woman in a non-emergency, non-cancerous situation without her consent. These experts support this Court's view, therefore, that surgical removal of an ovary and tube is not reasonably incidental to a pelviscopy and, absent an emergency, should not be undertaken without the patient's consent.
To expand the language in Nolan to allow a physician to operate in excess of a patient's consent in non-emergency situations would eviscerate the law of informed consent. Dr. Barry Shah testified that he removed plaintiff's ovary because he believed it was a diseased organ. His action in this regard shows that he made that decision for the plaintiff, without informing her of the many risks or complications that could follow. The record reflects the fact that there were multiple options available to the plaintiff before her ovary and tube were removed. As the plaintiff asserts, she could have had the laparoscopic pelviscopy previously discussed without the removal of the ovary and tube to determine if that procedure eliminated her abdominal pain. *Page 30 
After all, no expert at trial opined that leaving her ovary and tube intact after removal of the endometriosis would have caused her to suffer continued pain or adversely affected her health. If her symptoms were not completely relieved by the removal of extensive endometriosis, she could have decided at a later date if additional surgery was an acceptable option. She could have taken the medication previously suggested to relieve any residual pain or she could have decided to do nothing at all to address her pain. Even if her physician would have viewed such choices as unwise (and there is no evidence to suggest such a proposition), this was not her physician's choice to make. The decision was hers to make personally, as the patient, after consultation with her doctor.
At the time that battery law developed, "surgery, even a major operation, was generally performed in the home of the patient, who ordinarily was conscious, `so that the physician could consult him [or her] in respect to conditions which required or made advisable an extension of the operation.'" Samoilov,536 A.2d 275 at 279 (quoting Kennedy v. Parrott,90 S.E.2d 754 at 757-758). With the evolution of medical technology and the increased percentage of patients who use anesthesia, courts have rejected the "doctrine that would impose liability for a battery on physicians whose treatment deviated from that agreed to, however slight the deviation and regardless of the reasonableness of the physician's conduct." Id. at 280 (citing Woolley v.Henderson, 418 A.2d 1123, 1133 (Me. Sup. Jud. Ct. 1980)). While this Court must be mindful of the way anesthesia has changed informed consent law and burdened a physician's ability to obtain a patient's consent when the unexpected occurs, it must strike a balance that allows a physician appropriate latitude in operating while protecting a patient's right to self-determination in non-emergency situations. *Page 31 
The law must respect the private decision-making right of a patient, while not holding a physician to a standard so unrealistic and unreasonable that it becomes impossible to perform his or her job. This balance was reflected in the Supreme Court's decision inNolan which held that a physician only should be held liable for battery when his or her patient did not consent to a procedure and such a procedure did not take place in the context of "pathologically necessary or reasonably incidental" circumstances. For such a reason, the concept of "consent," "pathologically necessary" procedures and surgery "reasonably incidental" to that to which a patient consented should not be interpreted, as Dr. Barry Shah suggests, to include any procedure the physician deems "reasonably necessary." If such an interpretation were adopted, then the exception would swallow the rule with respect to consent in cases of medical battery, defeating the very protections offered by the law that require physicians to inform their patients of the contemplated procedure — and its risks — before proceeding.
This Court thus finds that, even after viewing the evidence in a light most favorable to him, Dr. Barry Shah not only lacked consent, but removed the plaintiff's ovary and tube in circumstances that were neither pathologically necessary nor reasonably incidental to the surgery contemplated. An ovary is of distinct value to the female patient — one that cannot be determined by a physician without, at a minimum, an express dialogue with that patient regarding the possibility of its removal. There is no reason that such a dialogue did not and should not have taken place here between Dr. Barry Shah and Ms. Spaight; though he did not expect to remove her ovary and tube, the possibility that the endometriosis he suspected could involve her ovaries and tubes or contain cysts was not so remote as to reasonably preclude a discussion as to the possibility of such removal. Absent such dialogue and the patient's express consent or a medical emergency situation, a physician must not remove a woman's ovary and tube as part of an *Page 32 
operative pelviscopy designed only to confirm the presence or absence of endometriosis and to remove any found endometriosis. As no reasonable persons could conclude from the evidence that Ms. Spaight gave Dr. Barry Shah consent to remove her ovary and tube or that he removed them incidentally or in an emergency situation, he violated the doctrine of medical battery as a matter of law.See R.I. Super. R. Civ. P. 50; Pimental v. D'Allaire,114 R.I. 153, 156-157, 330 A.2d 62, 64 (1975).
For these reasons, this Court grants the plaintiffs' Rule 50 motion for judgment as a matter of law as to liability on their informed consent claim that is premised on a theory of battery. As a result of the granting of that motion, a new trial will be required, and is hereby ordered, on the issue of causation and damages. In this new trial, the jury will be asked to determine the appropriate amount of monetary compensation to be awarded plaintiffs as a proximate result of the surgery performed on plaintiff, Linda Spaight without her consent. Damages would include the value of her left ovary and tube that were removed without her consent and any harm such as an alleged perforated ureter, four subsequent surgeries and the pain and suffering associated with those events that plaintiffs can prove were proximately caused by that wrongful removal. See Shepardson v. Consolidated Med.Equip., 714 A.2d 1181, 1184 (R.I. 1998) (holding that damages that are foreseeable are recoverable in a suit for medical malpractice).
 III PLAINTIFFS' MOTION FOR NEW TRIAL
In addition to moving for judgment as a matter of law as to their informed consent claim based on a theory of battery, plaintiffs move, in the alternative, for a new trial against Dr. Barry *Page 33 
Shah on this claim. Plaintiffs also move for a new trial against all defendants on the issue of medical negligence.
This Court has awarded judgment as a matter of law in favor of the plaintiffs as to their battery-based informed consent claim against Dr. Barry Shah. In this Court's view, its ruling in this regard subsumes the plaintiffs' motion for new trial as to this claim. Alternatively, this Court will assume, arguendo, that plaintiffs are not entitled to judgment as a matter of law under Rule 50, and go on to address the question of whether plaintiffs are nonetheless entitled to a conditional grant of their new trial motion on the issue of battery.[17] This Court also will consider whether plaintiffs are entitled to a new trial on the issue of medical negligence as to all defendants.
 A. Standard of Review
"If a renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed." R.I. Super. R. Civ. P. 50(c)(1). In so doing, "the court shall specify the grounds for granting or denying the motion for a new trial." Id.
The Rhode Island Supreme Court has established the steps that the trial justice should take when reviewing a motion for new trial: "First, `the trial justice must consider the evidence in light of the charge to the jury'[;] [s]econd, `the trial justice must determine his or her own opinion of the evidence. The trial justice then must weigh the credibility of the witnesses and other evidence and choose which conflicting testimony and evidence to accept and which to *Page 34 
reject'[;] [t]hird, the trial justice must make `an individual assessment of the evidence' and determine whether he or she `would have reached a different result from that of the jury.' If the trial justice agrees with the jury's verdict, the verdict should be affirmed." State v. Mondesir,891 A.2d 856, 862 (R.I. 2006) (citations omitted). If the trial justice does not agree with the jury's verdict, however, he or she must "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict does meet this standard, the trial justice may grant a new trial." Id. at n. 3 (quoting State v. Banach,648 A.2d 1363, 1367 (1994)). "However, in cases when the evidence is so balanced that reasonable individuals could differ, the motion should be denied." Id.
 B. New Trial for Battery
In the alternative to granting judgment as a matter of law in favor of plaintiffs on their battery claim against Dr. Barry Shah, there are additional reasons that they should be granted a new trial as to that claim. First, even if this Court were to assume,arguendo, that judgment as a matter of law is not appropriate as to plaintiffs' claim for battery, it would have to address the weight of the evidence under the law of battery. For all of the reasons stated previously in granting plaintiffs judgment as a matter of law as to battery, the clear preponderance of the evidence suggests that Ms. Spaight did not consent to surgical removal of her ovary and tube and that such removal was neither reasonably incidental to the surgery to which she gave consent nor pathologically necessary. See Decision, supra.
This Court has reviewed the evidence and finds that, mindful of the law of battery, reasonable minds could not have differed with regard to these issues. Ms. Spaight has proven battery by the clear preponderance of the evidence, and the jury's verdict to the contrary fails to *Page 35 
respond to the merits of this controversy or to do substantial justice in this case. See Crum v. Horowitz,896 A.2d 736, 739 (R.I. 2006) (citations omitted). On that basis, plaintiffs would be entitled to a new trial as to their claim of medical battery against Dr. Barry Shah should it be determined that they are not entitled to judgment as a matter of law as to that claim.
Additionally, plaintiffs should be entitled to a conditional grant of a new trial on their battery claim because the jury undoubtedly was confused by the way plaintiffs positioned their informed consent claims at trial, with no objection from the defendant. Rather than confining the trial to the issue of battery, plaintiffs coupled their battery-based informed consent claim, dependent on proof of lack of consent, with the more traditional informed consent claim of failure to disclose the risk of injury to the ureter. Launching this two-pronged informed consent attack in and of itself created confusion, as plaintiffs spent much of the trial arguing the illogical proposition that Dr. Barry Shah failed to disclose to Ms. Spaight the risks of a surgical procedure that neither of them contemplated and to which she did not consent.
Plaintiffs' informed consent case, in all fairness, should have been confined to a claim for battery, rising or falling on the issue of consent, and guided exclusively by instructions on battery law and not a mix of battery and negligence-based informed consent law. Evidence of defendant's failure to disclose the risk of injury to the ureter then could have been introduced as proof of the defendant's failure to obtain Ms. Spaight's consent and argued as reason for why her consent to removal of her ovary and tube was imperative, rather than being posited as a basis for a separate informed consent claim. Indeed, absent any evidence of consent to the surgery actually performed-as was the case here where neither party contemplated removal of the ovary and tube — this Court is hard-pressed to find, in retrospect and notwithstanding the parties' failure to address this issue either at trial or in their post-trial motions, that a claim of battery based on *Page 36 
implied consent can be married with an alternative negligence-based informed consent claim for failure to disclose risks of a procedure that was not contemplated by the parties. If a patient impliedly consents to an operation that was not contemplated, either because it was reasonably incidental to the surgery to which the patient consented or it was performed out of pathological necessity, it necessarily follows that the physician cannot be required to disclose material risks of the surgery that was not envisioned and that the physician's failure to disclose such risks cannot be the basis for a separate negligence-based informed consent claim. Viewed in this light, this Court may well have erred in allowing the jury to consider both plaintiffs' battery-based and negligence-based informed consent claims, even in the absence of an objection by the parties. Given the state of the evidence at trial and the confusing nature of this two-pronged attack, this Court is of the view that it should have dismissed plaintiffs' negligence-based informed consent claim sua sponte and instructed the jury exclusively on the law of battery.
Moreover, even if it were proper for the jury to have considered both informed consent claims, a new trial is warranted based on the confusion that undoubtedly resulted from the way those claims were positioned for the jury's determination. Plaintiffs initially mischaracterized their battery claim as one of two negligence-based informed consent claims. This Court, without objection of the parties, adopted plaintiffs' mischaracterization of their battery claim as a negligence-based informed consent claim. This mislabeling of the battery claim as an informed consent claim in and of itself may not have constituted legal error sufficient to warrant a new trial because, regardless of that label, this Court instructed the jury on the law of battery within its informed consent charge. Yet, by initially instructing generally on the law of informed consent, without distinguishing between plaintiffs' battery-based and negligence-based informed consent claims, and then subsequently reinstructing on the law of informed consent by separating *Page 37 
the two claims but keeping them under the same informed consent umbrella (even though the elements of proof as to each claim were different), this Court's charge and verdict form, though not challenged by the parties on those grounds, may well have been misleading and confusing to the jury. This error was compounded because it was never made clear to the Court or the jury — in argument, requests for charge, the Court's instructions or in post-trial memoranda — as it is clear to the Court now, that the jury could reach plaintiffs' negligence-based informed consent claim only if it first found that she consented, before the surgery, to removal of her ovary and tube.
Additionally, defendant made an impassioned argument repeatedly throughout the trial, during the examination of witnesses as well as in his closing statement, that had Dr. Barry Shah not removed plaintiffs' ovary and tube, he would have been sued any way; when Ms. Spaight still had a diseased ovary and abdominal pain following the surgery, she would have sued him for not removing the ovary during the first surgery. This argument, though not objected to, was wholly improper. It was speculative, as there was no evidence that Ms. Spaight would have continued to experience pain had her ovary been left intact, and it improperly portrayed her as a wrongfully litigious litigant. It misled the jury on the issue of consent by suggesting that issue turned on the reasonableness of the defendant's choice to remove the ovary for her rather than on what plaintiff wanted done with her body.
For each of these reasons, considered singly or in the aggregate, in the alternative to granting judgment as a matter of law as to plaintiffs' battery-based informed consent claim, this Court would grant plaintiffs a new trial as to that issue. In this Court's view, as neither Ms. Spaight nor Dr. Barry Shah contemplated the surgery actually performed and as defendant concedes that there is no evidence to support pathological necessity, such new trial would be *Page 38 
confined to the issue of whether the surgery performed was a substantially different procedure from or reasonably incidental to the surgery to which Ms. Spaight gave consent and whether the absence of such implied consent, if any, was a proximate cause of personal injury to plaintiffs.[18]
 C. New Trial for Medical Negligence
Plaintiffs also claim that this Court should grant them a new trial against all defendants for medical negligence. "[T]o sustain a cause of action for negligence, plaintiff is required to establish a standard of care as well as deviation from that standard." Bogosian v. Mercedez-Benz of N. America,Inc., 104 F.3d 472, 475 (1st Cir. 1996). To establish both the standard of care and a defendant's deviation, plaintiffs must produce evidence in the form of expert testimony.Dunning v. Kerzner, 910 F.2d 1009, 1014 (1st
Cir. 1990). In general, Rhode Island law holds a physician to the standard of care of a reasonably competent physician in a similar class and under like circumstances. Sheeley v. MemorialHospital, 710 A.2d 161, 167 (R.I. 1998). Each physician's actions must be evaluated in the light of all of the facts and circumstances with which he or she was confronted at the time and not in consideration of what hindsight has revealed as the proper course of action. See Wilkinson v. Vesey, 110 R.I. at 613,295 A.2d at 682.
1. Dr. Reza Shah-Hosseini and Dr. Botte
Plaintiffs argue that the weight of the evidence suggests that Dr. Reza Shah-Hosseini and Dr. Botte failed to meet the standard of care for a physician assisting in a laparoscopic surgery. They seek a new trial to hold those two physicians liable for medical negligence. In addition, *Page 39 
plaintiffs seek a new trial to hold defendant, Women and Infants Hospital liable for Dr. Botte's alleged negligence because it was her employer at the time in question.
Plaintiffs' expert, Dr. Barbieri, stated that Dr. Reza Shah-Hosseini, if he were acting as the assisting surgeon that day, would be held to the same standard of care as Dr. Barry Shah. Dr. Reza Shah-Hosseini billed as an assistant physician for this procedure, but the testimonies of all physicians present that day suggested that he left the operating room sometime in the early stages of the procedure, before the removal of Ms. Spaight's ovary and tube. On cross-examination, Dr. Barbieri agreed that it was a common and correct practice for a physician scheduled to assist in a surgery to charge for that time, as it was time he had to schedule away from his office. Dr. Barbieri further agreed that the physician scheduled to assist would not be required to stay throughout the procedure if a resident were present.
Here, the evidence suggests that Dr. Botte, a resident physician at Women and Infants Hospital of Rhode Island, was available and present. The weight of the evidence indicates, therefore, that Dr. Reza Shah-Hosseini's role in the procedure was quite minor and ended before any of the actions alleged to constitute medical negligence occurred. Reasonable jurors thus could have determined that plaintiffs failed to establish that Dr. Reza Shah-Hosseini assumed or should have assumed a role as an assisting physician in this procedure during the time of the ovary and tube removal, and thus failed to prove their negligence claims against him. This Court thus denies plaintiffs' motion for new trial with respect to Dr. Reza Shah-Hosseini.
With respect to Dr. Botte, Dr. Barbieri testified that an assisting physician (in this case the resident) is much like a co-pilot. He equated the surgeon to a pilot and stated that it was the responsibility of an assisting physician, as co-pilot, to discuss the flight plan — the cognitive aspects — with the pilot and to speak up if he or she thought something was amiss. It is clear *Page 40 
from the testimony of Dr. Botte and Dr. Barry Shah that Dr. Botte rightfully declined to take technical control over the procedure to remove the ovary, as Ms. Spaight's anatomy proved too complicated for the inexperienced surgeon to navigate. Thus, the only possible responsibility Dr. Botte had was with respect to the "cognitive element" of the surgery. Dr. Barbieri stated that the surgery should have been a team effort and that Dr. Botte was responsible for discussing with Dr. Barry Shah the possibilities for identifying and segregating the ureter. While Dr. Barbieri would not agree with defense counsel that Dr. Botte was free from any liability with respect to medical negligence, he was unable to state precisely what she had done to deviate from the standard of care.See Bogosian, 104 F.3d at 475. Moreover, Dr. Botte gave convincing testimony about the difficulties Dr. Barry Shah encountered in identifying the ovary and the care he took in excising it under difficult operative conditions.
As such, reasonable jurors could have rejected Dr. Barbieri's opinion testimony that attempted to suggest, albeit in ill-defined terms, that Dr. Bottte deviated from the standard of care. They could have accepted Dr. Botte's testimony that she thought through the steps for identifying and segregating the ureter and that she offered her assistance to Dr. Barry Shah as required by the vague standard of care for a medical "co-pilot." This Court finds, therefore, that reasonable jurors could have found that plaintiffs failed to meet their burden of proof with respect to their claim of medical negligence against Dr. Botte and, by extension, their claim against Women and Infants Hospital of Rhode Island as Dr. Botte's employer. Accordingly, plaintiffs' motion for new trial with respect to Dr. Botte and Women and Infants Hospital of Rhode Island is denied.
2. Dr. Barry Shah *Page 41 
Plaintiffs' claim with respect to Dr. Barry Shah presents the Court with a much more complicated question. Upon reviewing the evidence anew as a "super-juror," Wellborn v. Spurwink/RhodeIsland et al., 873 A.2d 884, 887 (R.I. 2005), this Court is inclined to categorize Dr. Barry Shah's actions in three substantial steps, each requiring a separate standard of care. During the laparoscopy, Dr. Barry Shah identified severe endometrial adhesions and cysts involving Ms. Spaight's left ovary and fallopian tube. All parties agree that when a physician is faced with severe endometriosis, he or she must be aware that the disease often can cause the ovarian vein and artery to come in close proximity to the left ureter. Dr. Barbieri testified that these organs may be so close that they are literally living intimately with each other. The parties agree that under these conditions, a prudent physician will take steps to identify the ureter so that he or she may avoid it in the course of cutting or cauterizing the ligaments surrounding the ovary to remove the diseased tissue. The first substantial step taken by Dr. Barry Shah, therefore, was to attempt to identify the ureter before he determined the best course of action for removing the endometriosis. On the question of whether Dr. Barry Shah performed this step in compliance with the standard of care, the Court finds that reasonable minds could differ.
Dr. Barbieri testified that the standard of care required a physician to take three essential steps to locate the ureter. First, the physician must attempt to visualize the ureter directly by bringing the laparoscope near the ovary. Second, if the ureter cannot be visualized, the physician would be concerned that the left artery was drawn near the left ureter and so would take the laparoscope higher up, to the junction of the pelvis and abdomen, and follow the ureter back down to where the physician would operate on the ovary. If the physician is still unable to locate the ureter, he or she would go up to the pelvic rim, and making an incision, dissect the *Page 42 
peritoneum. Dissecting the peritoneum, which was described as consisting of two thin layers of tissue, would cause the ureter to move away from the infundibular pelvic ligament.
Dr. Barbieri testified that the medical records showed no indication that Dr. Barry Shah performed these steps or successfully located the ureter. Defendants did not dispute Dr. Barbieri's conclusion that they never saw the ureter. Dr. Botte testified that she had looked for the ureter but could not see it and knew only where it was supposed to be. Dr. Barry Shah testified that he identified the ureter, but did not see it. He further testified that throughout the procedure he took care not to cause injury to the neighboring ureter, wherever it was.
Although it is undisputed that Dr. Barry Shah never precisely located the ureter, both he and Dr. Botte contend that they took all possible steps to identify it in compliance with the standard of care. Dr. Botte testified that she and Dr. Barry Shah attempted to visualize the ureter directly using the laparoscope, and when visualization proved unsuccessful, they attempted to go to the pelvic rim to see the ureter but could not due to extensive scarring and adhesions in the bowel. Dr. Barry Shah corroborated this testimony, stating that they took steps to visualize the ureter and approach the pelvic rim, but their efforts were frustrated due to adhesions. Additionally, Dr. Botte and Dr. Barry Shah testified that they never attempted the third step, which was to dissect the peritoneum. Both physicians agreed that dissecting the peritoneum where the tissue is thickened and adhered due to disease poses too much risk of cutting a major blood vessel, or the ureter itself, which lies on the other side.
Furthermore, defendants' expert, Dr. Young, testified that Dr. Barry Shah had no responsibility to attempt to pierce the sidewall to search for the ureter because the risks of injury to other blood vessels and organs are amplified where the anatomy is complicated by scarring and adhesions. Even plaintiffs' expert, Dr. Barbieri, conceded that the physicians could have *Page 43 
risked damage to other organs if they had opted to take this step. Dr. Young testified that defendants met the standard of care in the steps they took to identify the ureter. He stated that, under the circumstances, locating the ureter was impossible.
In reviewing this evidence, this Court finds that reasonable jurors could have concluded that Dr. Barry Shah met the standard of care with respect to identifying the ureter. Although it is quite clear that Dr. Barry Shah failed to pinpoint the organ's location and abandoned the steps necessary to find it, a reasonable person could have concluded from the evidence presented that all reasonable steps were taken. Reasonable jurors could have accepted the testimonies of Dr. Botte and Dr. Barry Shah, stating that they took the first two steps established by Dr. Barbieri to identify the ureter, notwithstanding the absence of documentation that they did so in the medical record, and that they reasonably determined that the third step, dissecting the peritoneum, was too dangerous under the conditions presented. All testifying physicians, including the plaintiffs' expert, agreed that dissection of the peritoneum could cause serious injury in the situation presented. This Court must conclude, therefore, that reasonable minds could differ as to whether the deviation was one a reasonably competent physician would make under the circumstances. See Boccasile v. Cajun MusicLtd., 694 A.2d 686, 689 (R.I. 1997) (stating that the plaintiff must show that the defendant physician's deviation from the standard of care was negligent, rather than a legitimate alternative).
Attempting to identify the ureter was the first of three substantial steps taken by Dr. Barry Shah in the course of the laparoscopic procedure. Once it is determined that identification of the ureter is impossible under the circumstances, the physician must make a decision about whether, and to what extent, to proceed with the removal of endometrial tissue involving the ovary. With respect to this step, this Court finds that Dr. Barbieri failed to set out a clear standard of care. Dr. Barbieri *Page 44 
testified that when the ureter cannot be identified, the safest alternative is to end the surgery altogether and schedule a second, non-laparoscopic surgery to remove the endometriosis. However, Dr. Barbieri went on to suggest that this was not the only option. He proffered that, alternatively, a physician might try to take out the endometrial cyst rather than the entire ovary. He agreed that this process may have implicated the use of the same electrocautery device that Dr. Barry Shah used to sever the infundibular pelvic ligament and which may have, during that severance, led to the injury in this case.[19] Therefore, one of the presented alternatives within the standard of care would have posed a similar, albeit lessened, risk to the imprecisely located ureter.
The options set forth by Dr. Barbieri do not establish an absolute, objective standard with which a physician must comply nor do they impose a clear subjective standard. SeeVoinovich v. Women's Med. Prof'l Corp.,523 U.S. 1036, 1038 (1998). In fact, Dr. Barbieri agreed on cross-examination that the decision of how to proceed was within the medical judgment of the physician who had spoken with the patient and who was in the operating room, viewing the complex cysts within the patient's ovary. The evidence could suggest, therefore, that the decision of how to proceed was within the discretion of the treating physician and that there were a number of choices a reasonable physician might make — including the decision (assuming consent) to remove the ovary altogether. *Page 45 
Because the issue of medical negligence presents a question entirely separate from the issue of informed consent, this Court has engaged in this discussion assuming, arguendo, that the acting physician had the consent of the patient to conduct the various procedures. The question presented in this section of the Decision is not whether Dr. Barry Shah had Ms. Spaight's consent, but rather, if he had, would his conduct have complied with the standard of care.
Dr. Botte testified that, ultimately, the question was one of judgment: if the patient was not in pain and the ovary not diseased, Dr. Barry Shah would not have risked injury to the ureter. If the physician determined instead that the ovary needed to be removed and that finding the ureter could cause damage to other significant structures, she said that there are physicians who would decide to proceed. In this case, Dr. Barry Shah had determined that the ovary was wholly involved with a complex cyst and that he should remove the ovary to get rid of the disease process.[20] Although Dr. Barry Shah's determination was not uncontroverted, plaintiffs have not set forth a standard that would prohibit a reasonable physician from making this determination, assuming consent. This Court finds, therefore, that reasonable jurors could have found that Dr. Barry Shah's decision to remove the ovary, although perhaps risky and unwise in hindsight, was not negligent.
The final question with respect to Dr. Barry Shah's negligence is whether he operated the electrocautery device reasonably considering his decision to remove the ovary without locating the ureter. With respect to the use of the device, plaintiffs contend that a passage from the *Page 46 
recognized medical treatise, Operative Gynecology, 9th edition, Chapter 37, establishes the standard of care. At trial, however, this treatise was not introduced into evidence by plaintiffs to establish the standard of care. Instead, counsel read a portion of the treatise which stated that "when using instruments that transmit energy to the tissue, the surgeon must know exactly how broad the zone of thermal injury is for the instrument and at the power setting," and asked simply whether Dr. Barbieri agreed with that passage. Dr. Barbieri answered that he agreed.[21]
Under the Rhode Island Rules of Evidence, a learned treatise may be read into evidence "[t]o the extent called to the attention of an expert witness on cross-examination or relied upon by the witness in direct examination. . . ." R.I. R. Evid. 803(18). Here, the treatise was read on direct examination, but it was not clear from Dr. Barbieri's testimony that he was relying on it for his opinion testimony or that he viewed the text as establishing the standard of care.[22] Apart from the text, he never opined that the standard of care required the operating physician to know the breadth of the zone of thermal injury when operating an electrocautery device, and he never indicated that such a standard of care applied to Dr. Barry Shah under the circumstances of this case. *Page 47 
Assuming, without deciding, that the treatise passage used in this manner can be considered as establishing the standard of care, this Court finds that reasonable jurors could have concluded that plaintiffs still failed to meet their burden. To sustain a claim for negligence, a plaintiff must establish not only the standard of care, but also the treating physician's deviation from that standard. Bogosian, 104 F.3d at 475. Even allowing this treatise to stand as a statement of the standard of care adopted by Dr. Barbieri, Dr. Barbieri never opined that Dr. Barry Shah deviated from this standard of care in his use of the tripolar electrocautery device. There was no direct evidence of the size of the zone of thermal injury for the device used by Dr. Barry Shah or that Dr. Barry Shah was either unaware of the zone of thermal injury for the device he employed or that he was clearly within that zone of injury.
While reasonable jurors certainly could have inferred from the fact that thermal injury did occur to the ureter that Dr. Barry Shah operated the device within the zone of injury, and thus violated the standard of care, he testified that he pulled the ovary at least one inch and perhaps as far as three inches away from the pelvic sidewall before cauterizing the infundibular pelvic ligament. In the absence of expert testimony that he deviated from the standard of care, and the absence of evidence as to the size of the zone of injury and Dr. Barry Shah's awareness of that zone, reasonable jurors could have concluded that plaintiffs failed to prove negligence in the use of the device. They could have accepted Dr. Barry Shah's testimony that he took reasonable care in creating what he believed to be sufficient distance between the zone of heat and the ureter which laid (somewhere) beyond the pelvic sidewall.
Reasonable jurors further could have concluded that plaintiffs failed to prove deviation from the standard of care. During deliberations, the jury submitted a question to the Court requesting clarification as to whether Dr. Barry Shah knew the zone of thermal injury. This *Page 48 
Court responded that no evidence had been presented to that effect. The jury's inquiry suggests that they grappled appropriately with the issue of whether Dr. Barry Shah had met the standard of care with respect to his use of the electrocautery device. The lack of evidence to aid the jury in resolving this quandary suggests that reasonable jurors could have found that plaintiffs failed to prove negligence as to this point. After all, Dr. Young testified that Dr. Barry Shah's attempt to pull the ovary away from the sidewall met the standard of care in this difficult situation and that it was reasonable to use the electrocautery device with these precautions even when the ureter was not precisely located.
It is not the prerogative of this Court to fill these evidentiary gaps. Considering only the evidence presented, and regardless of whether this Court may have concluded otherwise, reasonable minds could have concluded that Dr. Barry Shah met the standard of care, or at least that plaintiffs failed to prove otherwise, and that Ms. Spaight's injury was an unfortunate, rare, and unforeseeable complication of surgery.
Dr. Barry Shah made three substantial decisions in this case: what steps he would take to locate Ms. Spaight's left ureter, how he would proceed once the ureter was unidentifiable and the ovary was determined to be diseased, and how he would operate the electrocautery device once he had decided to perform the salpingo-oophorectomy. For the reasons stated above, the Court finds that reasonable minds could differ with respect to the first issue and that reasonable jurors could conclude that plaintiffs failed to meet their burden of establishing both a standard of care and deviation from the standard with respect to the remaining issues.
This Court reaches this decision mindful of its prior decision, as affirmed by the Rhode Island Supreme Court, in Franco v.Latina, 916 A.2d 1251 (R.I. 2007). Indeed, this Court requested the parties in this case to address the impact of Latina on plaintiffs' motion for new *Page 49 
trial, as the cases have remarkable parallels as to the perils of laparoscopic surgery. This Court finds, however, that the two cases also may be distinguished such that Latina does not require this Court to grant plaintiffs a new trial as to their claims of medical negligence in this case.
In Latina, the defendant physician performed laparoscopic surgery to remove the plaintiff's infected gallbladder.Id. at 1253. During the procedure, Dr. Latina mistakenly cut Ms. Franco's common bile duct, having misidentified it as the cystic bile duct. Id. at 1255-1256.[23] Judgment as a matter of law was granted in that case because the uncontested standard of care[24] required "conclusive and unmistakable identification in fact of the cystic duct before cutting," id. at 1262, and Dr. Latina candidly admitted that he had made no such conclusive identification. Id. at 1257.
Here, like Dr. Latina, Dr. Barry Shah failed unequivocally to identify an anatomical structure (the ureter) prior to the removal of a diseased organ through a laparoscopic procedure. UnlikeLatina, however, the experts here did not agree upon an absolute standard of care. The defendant's expert in this case, Dr. Young, testified that unequivocal identification of the ureter in a situation like Ms. Spaight's was impossible. He further stated that Dr. Barry Shah was under no obligation to dissect the peritoneum to locate the ureter if it would present a greater risk than proceeding without clear identification of the structure. Even the plaintiffs' expert, Dr. Barbieri, *Page 50 
stated that it was within the physician's judgment to proceed under the circumstances.[25] Without an absolute, objective standard of care, or an uncontradicted violation of that standard, this Court must leave the question of Dr. Barry Shah's negligence as an issue of fact for determination by the jury. Seeid. at 1262.
In addition, in Latina, the physician cut the incorrect bile duct. Here, Dr. Shah applied an electrocautery device to a structure that he had clearly identified (the infundibular pelvic ligament) and a latent heat injury to the ureter resulted. If Dr. Shah had cut the ureter during this procedure, the case for finding him negligent would be much stronger.[26] Here, the ureter was not cut; it was not even sutured or ligated. Dr. Shah applied an electrocautery device, not to the ureter, but to an entirely separate structure located on the other side of the pelvic sidewall. In light of the latency and indirectness of the injury, and the fact that reasonable jurors could find that plaintiffs failed to prove that the injury was due to Dr. Barry Shah's deviation from the standard of care, this Court finds this case distinguishable from, and therefore not controlled by, *Page 51 Latina. This Court thus denies plaintiffs' motion for new trial against all defendants on the issue of medical negligence.[27]
 IV CONCLUSION
For the reasons stated above, this Court grants plaintiffs' motion for judgment as a matter of law as to their claim of battery, and, in the alternative, grants plaintiffs' conditional motion for a new trial as to that claim. The Court denies plaintiffs' motion for new trial on their claim of medical negligence as to all defendants. In light of its analysis and decisions on these motions, it is not necessary for the Court to reach the defendants' motion for judgment as a matter of law as to plaintiffs' informed consent and negligence claims.
Counsel shall confer and submit to this Court forthwith for entry an agreed upon form of order and judgment this is consistent with this Decision.
[1] Plaintiffs and the defendant physicians also agreed to dismissal of Count IX of plaintiffs' second amended complaint which stated causes of action against the defendant physicians for res ipsa loquitur.
[2] To establish a violation of the negligence-based doctrine of informed consent, the Court outlined a five-part test, requiring plaintiff to prove, by a preponderance of the evidence, that: (1) the defendant's disclosure to the plaintiff regarding a particular risk was unreasonably inadequate; (2) the undisclosed risk was a known material risk; (3) the undisclosed known material risk did in fact occur; (4) the plaintiff would not have undergone the procedure if advised of that risk; and (5) the specific injury or harm of which the plaintiff complains was the proximate result of the occurrence of that risk. Wilkinson v. Vesey,110 R.I. 606, 627, 295 A.2d 676, 689 (1972); seeKenney v. Wepman, 753 A.2d 924, 926 (R.I. 2000); Lauro v.Knowles, 739 A.2d 1183, 1186 (R.I. 1999).
[3] In Nolan, the Supreme Court recognized a battery action where a patient consented to surgery to strengthen the ligaments supporting the spleen, but the physician then removed the spleen without the patient's consent.
[4] See, e.g., Jaskoviak v. Gruver,638 N.W.2d 1, 14 (N.D. 2002); Backlund v. Univ. of Wash.,137 Wa.2d 651, 665 (Wash. 1999); Shine v. Vega,429 Mass. 456, 463 (Mass. 1999); Largey v. Rothman,110 N.J. 204, 212 (N.J. 1988); Phillips v. Hull,516 So. 2d 488, 493 (Miss. 1987); Wheeldon v. Madison,374 N.W.2d 367, 374 (S.D. 1985); McMahon v. Finlayson,36 Mass. App.Ct. 371, 372-373 (Mass. App.Ct. 1994);Vergie M. Lapelosa, Inc. v. Cruze,44 Md. App. 202, 211 (Md. Ct. Spec. App. 1979); (all citingWilkinson to support propositions that follow the majority view on informed consent law). See also Bundrick v.Stewart, 114 P.3d 1204 (Wash. App. 2005) (holding that an action for total lack of consent sounds in battery); Ashcraft v.King, 228 Cal. App. 3d 604 (1991) (battery action where plaintiff agreed to surgery on condition that blood donated would be from her family, but during surgery, the hospital used its general blood supply and plaintiff acquired HIV allegedly from transfused blood);Mink v. University of Chicago, 460 F. Supp. 713 (D. Ill. 1978) (battery action where plaintiffs were completely unaware they were given doses of DES as part of a double blind study); Lane v.Anderson, 345 Ill. App. 3d 256 (2004) (finding that a plaintiff can recover in a medical battery case by establishing: (1) a total lack of consent to the procedure; (2) the treatment was contrary to the patient's will; or (3) the treatment was at substantial variance with the consent granted).
[5] The Illinois Court of Appeals later overturned Green v.Hussey in Casey v. Penn, 45 Ill. App. 3d 1068, 1069 (1977), but on different grounds. Casey held that a plaintiff in an action for negligent post-operative treatment must prove by "affirmative evidence, not necessarily expert opinion testimony" that defendant's negligent treatment was a proximate cause of plaintiff's injury. Id.
[6] See Lugenbuhl v. Dowling,701 So. 2d 447 (La. 1997); Fortier v. Dehne,804 So. 2d 819 (La. App. 4th Cir. 2001).
[7] The many jurisdictions recognizing medical battery include California, North Carolina, Wisconsin, Minnesota, Montana, Oklahoma, Pennsylvania, and Tennessee. See, e.g., Duttry v.Patterson, 565 Pa. 130, 771 A.2d 1255 (2001); Blanchard v.Kellum, 975 S.W.2d 522 (Tenn. 1988); Bang v. Charles T. MillerHospital, 251 Minn. 427, 88 N.W.2d 186 (1958); Suskey v.Davidoff, 2 Wis. 2d 503, 87 N.W. Cal. 2d 306 (1958);Lewis v. Shaver, 236 N.C. 510, 73 S.E.2d 320 (1952);Bakewell v. Kahle, 125 Mont. 89, 232 P.2d 127 (1951);Cline v. Lund,31 Cal. App. 3d 755, 107 Cal. Reptr. 629 (Cal. 1st
Dist. 1973).
[8] While the Supreme Court of Louisiana later distinguished thePizzalotto decision, see Lugenbuhl v. Dowling,701 So.2d 447 (La. 1997), this Court finds the court's reasoning inPizzalotto to be consistent with Wilkinson and the majority of jurisdictions.
[9] The Wilkinson test is more appropriate in cases likeFlanagan v. Wesselhoeft, where the plaintiffs consented to the surgery at issue but asserted that the physician never informed them that their daughter might suffer nerve damage as a result of the cervical node excision. 765 A.2d 1203 (R.I. 2001). In the case at bar, in contrast, it is not a matter of the physician failing to inform the plaintiff of a risk of a consented-to procedure, but rather the alleged performance of a procedure, removal of an ovary and tube, that was never considered by either party before the surgery.
[10] For these reasons, this Court ultimately charged the jury, with the consent of all parties, as follows: A physician may not perform a procedure or operation different in kind from that to which consent was given in the absence of an emergency. Neither party challenged these jury instructions, as both parties agreed, given the facts at hand, that the five-part Wilkinson test would not be appropriate to plaintiffs' claim of non-consensual removal of the ovary and tube. While the defense claims that plaintiffs did not plead an action for battery here but instead stated a cause of action for violation of the doctrine of informed consent, the issue of battery, in this Court's view, was subsumed in this cause of action and tried by implication, with the consent of the parties, as reflected in the evidence, the parties' arguments to the jury, and this Court's charge.
[11] Query whether failing to recognize removal of an ovary and tube as a potential part of such a procedure was negligent on the part of Dr. Barry Shah. As plaintiffs have not raised such an issue on their own, and no testimony has been given on this point, it is not presently an issue before the Court. See infra for further discussion in motion for new trial analysis.
[12] There is no evidence in the record to suggest that leaving Ms. Spaight's ovary and tube in place after the removal of found endometriosis would have caused her to continue to suffer abdominal pain.
[13] See, e.g., Bendiburg v. Dempsey,909 F.2d 463, 468 (11th Cir. 1990); Tinius v. Carroll CountySheriff Dep't, 321 F. Supp. 2d 1064, 1086-1087 (D. Iowa 2004);Kennedy v. Parrott,243 N.C. 355, 363, 90 S.E.2d 754, 760 (N.C. 1953); Rogers v.Lumbermens Mutual Casualty Co.,119 So. 2d 649, 650 (La. App. 2nd Cir. 1960).
[14] See Samilov, 536 A.2d at 280 (citingWooley v. Henderson,418 A.2d 1123, 1133 (Me. Sup. Jud. Ct. 1980)).
[15] In Fox, a physician obtained a patient's consent for laparoscopic surgery to investigate the source of her abdominal pain. 594 So. 2d at 596. He had predicted and indeed found endometrial tissue during her operation. He also found that the patient's intrauterine device had pulled away from and damaged her cervix. Id. at 602. He removed this device in an effort to relieve the patient's pain. Id. While acknowledging that such an action may be lawful for a physician as an extension of the theory of implied consent, the Court upheld the jury's finding that the patient had expressly requested that this device not be removed. Id. at 605. The Court found, therefore, that the physician's removal of the device was not incidental to the surgery or reasonable under the circumstances. Id.
[16] Although the defense suggests that Linda Spaight, though a woman of childbearing age, had no desire to have children, that fact does not change this analysis. An ovary and tube can have importance to a woman both medically and psychologically, regardless of their importance to reproduction.
[17] Although this Court is mindful of the fact that it instructed the jury as to both plaintiffs' battery-based informed consent claim and their negligence-based informed consent claim, plaintiffs have moved for judgment as a matter of law and a new trial only as to their battery-based claim of informed consent. For this reason, this Decision will evaluate the plaintiffs' claim for a new trial only with respect to their battery-based claim.
[18] As a result of its decision as to plaintiffs' motion for judgment as a matter of law and, alternatively, a new trial on the issue of battery, as well as plaintiffs' failure to contest the jury's verdict as to their negligence-based informed consent claim, this Court need not reach Dr. Barry Shah's motion for judgment as a matter of law as to informed consent.
[19] Dr. Barbieri stated that during the removal of cysts, an electrocautery device may be used to control bleeding. Here, it was noted that the cyst in Ms. Spaight's left ovary was draining blood. It is likely that in this case, had Dr. Barry Shah chosen merely to remove the cyst, he would have had to use the very same instrument that caused latent perforation of Ms. Spaight's ureter. Although Dr. Barbieri conceded that a tripolar electrocautery device may have been used in the procedure to remove endometriosis even if Dr. Barry Shah had decided not to completely remove the ovary, he stated that such use would be less likely to cause heat injury to the ureter. In his expert opinion, using the electrocautery device so near to the pelvic sidewall in severing the infundibular pelvic ligament increased the risk of heat injury to the ureter. He opined that using the same device to remove only the cyst would have presented a lower risk of injury to the ureter, as the bulk of the ovary would have modulated the transfer of heat.
[20] There was a legitimate dispute over whether the ovary was diseased to the extent that Dr. Barry Shah indicated. Dr. Barbieri stated that the ovary contained three cysts, the largest measuring 1.5 cm, and one containing endometriotic tissue. Under those conditions, it would not have been necessary to remove the entire ovary. However, this evaluation was made with the retrospective aid of a pathological report. All parties agree that in the process of producing the pathological report, the cysts are drained, and the ovary can be more precisely examined than when it is still within the patient's body. The parties further agree that Dr. Barry Shah could not have had the benefit of this report at the time of surgery and that he viewed the complex cyst within the otherwise distorted anatomy. Dr. Barbieri offered no testimony to rebut Dr. Barry Shah's testimony as to how the ovary appeared to him at the time.
[21]
 "Q: I am going to read this to you and ask if you agree —
 . . . .
 Q:. . . . Do I read this correctly, "when using instruments that transmit energy to the tissue, the surgeon must know exactly how broad the zone of thermal injury is for the instrument and at the power setting." Do you agree with that?
 A: Yes, I agree with that." (Unoff'l Tr. At 34-35).
[22] The Advisory Committee Notes to R.I. R. Evid. 803(18), recognizing that "[t]here is a lack of Rhode Island law on this subject," provide little guidance as to the use of learned treatises in this form. The notes state that use of a learned treatise as "substantive evidence" is limited to "situations in which an expert is on the stand and available to explain and assist in the application of the treatise if desired." R.I. R. Evid. 803(18) Advisory Committee Note. Taking this instruction in its broadest sense, this Court finds that Dr. Barbieri was on the stand and available to assist. The plain language of the treatise clearly sets out a standard of care to which Dr. Barbieri agrees, but it remains unclear whether Dr. Barbieri "relied" on this treatise as required in the language of the rule itself. Beyond his agreement with the read portion of this treatise, Dr. Barbieri never articulated a standard of care with respect to using the instrument. Although his testimony did not clearly rely on the treatise to establish the standard of care, other states that have adopted the same rule have read it to require that the treatise be used ". . . in conjunction with expert testimony." See, e.g., Cornelius v. Wilkinson, 2006 U.S. Dist. LEXIS 58207, *14 (D. Ohio 2006); United States v.Vital Health Prods., 786 F. Supp. 761, 771 (D. Wis. 1992). Although the form of questioning used here raises an issue as to the admissibility of the treatise, it does meet the lenient standard of having been used "in conjunction with" expert testimony.
[23] Ms. Franco, having grown ill after the surgery, sought medical attention from a different physician, who informed her that she would have to undergo major reconstructive surgery to her biliary system as a result of Dr. Latina's mistake.Latina, 916 A.2d at 1255. At the initial trial, the jury returned a verdict for the defendant, but this Court granted plaintiff's motion for new trial. Id. at 1256. At the second trial, the jury again returned a verdict for the defendant, and this Court granted plaintiff's motion for judgment as a matter of law, on which it had previously reserved decision.Id. at 1257.
[24] There was an issue on appeal as to whether the trial justice had properly stricken the opinion testimony of defendant's expert who had testified that the standard of care required clear identification of the cystic and common bile ducts prior to any cutting, but had stated that in his opinion, Dr. Latina had not been negligent. The Supreme Court upheld the trial justice's decision to strike the "powerful and . . . misleading" opinion, as it bore no connection to the expert's statement of the standard of care. Latina, 916 A.2d. at 1259, 1261.
[25] Furthermore, the Court in Latina left open the possibility that a "hostile environment" — one where "the patient's body impeded the surgeon's ability to see, navigate, and separate the anatomy of the patient, such as when the area in which the operation is being done is overrun with cancer or scar tissue" — may require a different standard of care with respect to identifying the structures. Latina,916 A.2d at 1263, 1263 n. 12. In Latina, it was uncontroverted that no such hostile environment existed. Id. at 1263. This case presented quite the opposite: all parties agree that a hostile environment did exist; that Dr. Shah faced considerable complications due to the scarring and adhesions in Ms. Spaight's pelvic structures; and that this may have changed the options available to Dr. Shah with respect to identifying the ureter.
[26] In considering analogous cases involving injury to the ureter, it appears that there is a greater likelihood of proving negligence on the part of the physician if the ureter was cut, as opposed to sutured or ligated. See, e.g.,Jackson v. Univ. Hospital, 809 So. 2d 1145 (2002); Pry v.Jones, 253 Ark. 234 (1972); (both cases find a physician negligent for severing the ureter during an oopherectomy or hysterectomy); but see Koch v. Gorilla, 552 F.2d 1170 (1977);Williams v. Ricks, 152 Ga. App. 555 (1979) (both cases upholding a verdict for the defendant physician where the ureter was sutured during oopherectomy or hysterectomy). These cases suggest that the less contact the operating physician had with the structure injured, the less likely it is that the plaintiff can prove conclusively that the injury was caused by negligence. Although the Court hesitates to apply such a broad generalization to the question of negligence in this case, it must note that the instant case arguably presented a more complex surgical situation.
[27] As a result of its decision to deny plaintiffs' new trial motion on the issue of defendants' negligence, this Court need not reach the balance of defendants' Rule 50 motions that argue for entry of judgment as a matter of law as to plaintiffs' claims against defendants for medical negligence on grounds of causation and after-acquired knowledge. The issue of causation connected with plaintiffs' battery claim against Dr. Barry Shah remains for trial, as it was not the subject of that dispositive motion and as there is sufficient evidence in the record to allow a jury to decide the question of what harms resulted to plaintiffs as a proximate result of Dr. Barry Shah's removal of Ms. Spaight's ovary and tube without her consent.